# IN THE COURT OF APPEALS OF IOWA

No. 17-1693
Filed October 24, 2018

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**COLTON EUGENE DUNPHY,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Union County, Patrick W. Greenwood, Judge.

Colton Dunphy appeals his conviction of operating while intoxicated. **AFFIRMED.**

David R. Johnson of Brinton, Bordwell & Johnson, Clarion, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

Colton Dunphy appeals his conviction of operating while intoxicated. He contends the district court erred in denying his motion to suppress evidence allegedly obtained in violation of his rights under Iowa Code section 804.20 (2016).

## I.    Background Facts and Proceedings

The following facts can be gleaned from the suppression record. At 2:03 a.m. on August 20, 2016, Officer Sam Abell of the Creston Police Department conducted a traffic stop of a vehicle driven by Dunphy. During the ensuing stop, Dunphy was subjected to field-sobriety testing. He submitted to a preliminary breath test at 2:33 a.m., after which he was arrested and transported to the local law enforcement center. Upon arrival at the law enforcement center, Abell and Dunphy proceeded to the "OWI room," entering the room seconds before 2:41 a.m.[1] Abell presented Dunphy with an implied-consent advisory form and stated he needed to explain to Dunphy what would happen if he refused or consented to a chemical test. Dunphy replied, "No weapons, I don't have any weapons, I have a cell phone." Abell continued and requested Dunphy to follow along with him on the form as he read and explained it to him. Abell then read the advisory to Dunphy, after which he advised Dunphy:

> I don't want you to make any decisions or anything right now. I'm going to allow you to actually make some phone calls to get advice or whatever the case may be, whatever you need to do. You're going to be able to make phone calls for whatever reason to whoever it may be. Whether it be family members, friends, lawyers, it doesn't matter, before you make your decision.

---

[1] A video of the happenings in the OWI room was admitted as evidence at the suppression hearing.

Immediately thereafter, at 2:44 a.m., Abell requested Dunphy submit to a chemical breath test. Dunphy advised, "I'm probably not going to sign anything until I call." Dunphy then asked Abell about the reasoning for the traffic stop. Dunphy and Abell spent the next approximately ninety seconds discussing the reasoning for the stop, with Dunphy exhibiting some agitation, after which Abell again advised, "Like I said, make phone calls to whoever it may be for whatever reason, family members, friends, lawyers, whatever the case. . . . Then I will . . . get your decision on everything and go from there." Abell instructed Dunphy how to use the office phone and additionally advised Dunphy he could use his cell phone to make any calls he desired. Abell provided Dunphy with two phone books.

At 2:48 a.m., Dunphy made a phone call to his mother, Susan. Among other things, Dunphy advised Susan he was entitled to several phone calls, and "figured he would call" her. Dunphy's phone call with Susan lasted just under two and a half minutes. Dunphy sat in silence for the next nearly four and a half minutes, which included multiple instances of Dunphy simply ignoring Abell's questions as to who he called. At 2:55 a.m., Abell read Dunphy his *Miranda* rights. Thereafter, Dunphy sat in silence for another three minutes and twenty seconds before Abell questioned, "Okay, so you're not making any more phone calls?" Dunphy responded, "Uh, I can. I've been reading is what I've been doing." Abell asked if Dunphy was prepared to make his decision whether to submit to chemical testing. Dunphy responded in the negative, stating, "No, I've been reading. That's what I've been doing. For the second time. Do I need to let you know when I'm done

reading?" Abell directed Dunphy to let him know when he was ready to make his decision.

Dunphy returned to his silent solitude for another three minutes and forty-five seconds before Susan arrived in the OWI room at just before 3:03 a.m. Susan spent the next nearly two minutes reading the advisory and asking questions, during which she advised Dunphy, "I'm waiting for Jim to text back a phone number for you." At 3:05 a.m., Susan asked if Dunphy could wait and talk to someone, presumably a lawyer, before he made his decision. Abell responded in the affirmative, stating they could wait "a few minutes," but advised if no decision was made at some point he would have to mark it down as a refusal. During the next nearly four minutes, Abell answered a number of Susan and Dunphy's questions, Dunphy exhibited his frustration with his situation by directing a number of confrontational statements toward Abell, and Susan admonished Dunphy about his attitude. At 3:09 a.m., Susan directed Dunphy to "just blow." Dunphy declined, explained he needed to think about it, and asked Abell how much time he had to decide. Abell responded, "A few more minutes." Susan then told Dunphy to just wait and talk to an attorney. Susan spent the next minute texting on her cell phone while Dunphy sat in silence. A minute later, Susan advised, "Jim wasn't available, he was gonna get someone else's number. I don't know who the person was. I wasn't listening, because I was driving. And he hasn't text me back the number yet." Dunphy responded, "Who?" Susan responded, Jim was getting her a number for another attorney.

At 3:12 a.m., after more silence and inaction by Dunphy, Abell advised Dunphy he would give him another fifteen minutes to make up his mind. The next

three and a half minutes largely involved questioning about Dunphy's preliminary-breath-test result and more agitation and questioning by Dunphy about the rationale for the traffic stop. At 3:16 a.m., Susan again advised Dunphy to "just blow, and we'll bail you out and deal with this later." Dunphy again asked how much time he had to decide to submit to chemical testing. Abell advised, "About nine now." Thereafter, Dunphy began reading his *Miranda* advisory out loud, after which Dunphy questioned Abell, "Where's my lawyer?" Susan stated, "I'm trying to find one." Dunphy then advised Abell, "I'll take my lawyer time, how 'bout that?" then threw the advisory at Abell. Abell responded, "Sounds good." Dunphy then accused Abell of never advising him he could talk to a lawyer. Abell explained to him the advisement would be recorded. Dunphy replied, "Good," and called Abell an idiot. At around 3:18 a.m., Dunphy aggressively continued to question Abell about the rationale for the traffic stop. Abell simply directed Dunphy to talk to his lawyer. At 3:19 a.m., Abell redirected Dunphy and Susan to the phonebooks if they wanted to call "a lawyer or anything like that." Neither Dunphy nor Susan reached for a phonebook, one of which Dunphy was resting his elbow on. At 3:20 a.m., Susan left the room, Dunphy continued his agitation, and Abell advised Dunphy he would give him another five minutes to make up his mind to refuse or consent. Dunphy then asked to read the implied-consent advisory again and accused Abell of not reading it to him. From 3:21 until 3:25 a.m., Dunphy continued to question Abell about the rationale for the traffic stop. During this exchange, Abell advised Dunphy twice that he had only minutes to make up his mind.

Shortly after 3:25 a.m., Abell requested a specimen and advised Dunphy a failure to consent would result in and be documented as a refusal. Susan advised,

"Jim Sinclair is our attorney, and he's not in town. So my husband is trying to get ahold of him because, I text him earlier and he was supposed to text me back another attorney's number and I just called him." Abell proceeded to request Dunphy to mark on the advisory whether he consented to or refused chemical testing. Dunphy responded, "Even without an attorney?" Abell advised Dunphy he gave him an ample amount of time to call an attorney. Dunphy then began re-reading the advisory. Just before 3:27 a.m., Susan declared she got ahold of Sinclair on her cell phone and handed it to Dunphy. After speaking with Sinclair on the phone for one minute and fifty-three seconds, Dunphy asked Abell, "How long has it been since the official arrest time?" Abell responded, "You are out of time." Dunphy communicated the same to Sinclair. Abell then advised, "Either you sign it yourself or I'm going to sign you as a refusal, literally in fifty seconds." Dunphy continued his phone conversation with Sinclair for another twenty-five seconds, after which Sinclair requested to speak with Abell. Abell and Sinclair spoke on the phone for just under a minute. According to Sinclair's testimony, he advised Abell he "would like to come down to the jail or have another attorney come down to the jail to speak with Mr. Dunphy in person and privately," but Abell "was not going to allow that," and told him he would be invoking implied consent as soon as the call terminated. The video evidence shows Abell informed Sinclair he had given Dunphy "ample time" and Dunphy was out of time. After speaking with Sinclair, Abell handed the phone back to Dunphy. Dunphy and Sinclair spoke on the phone for another eighteen seconds. According to Sinclair, he advised Dunphy there was not much he could do if Abell would be invoking implied consent

after the phone call. Dunphy concluded the conversation, "Okay, sounds good. Thanks Jim," and hung up.

After another minute or so of Dunphy examining the advisory and Abell instructing him how to fill it out, Dunphy signed his consent. The testing process began at 3:32 a.m. and ended roughly six and a half minutes later. The test returned an alcohol concentration of .174.

Dunphy was charged by trial information with operating while intoxicated, first offense. Defense counsel filed a motion to suppress alleging a violation of Dunphy's section 804.20 rights. Following a hearing, the district court denied Dunphy's motion to suppress, concluding Dunphy was afforded his rights under section 804.20. Dunphy filed a motion to reconsider, which the court denied, and then a second motion to reconsider, which the court also denied. Dunphy waived his right to a jury trial and the matter was submitted to the court on the minutes of evidence. At the commencement of the trial on the minutes, Dunphy moved to reopen the suppression record for the purpose of submitting additional testimony. The court granted the motion, considered the additional evidence, and declined to alter its suppression ruling. The court found Dunphy guilty as charged. Dunphy appealed following the imposition of sentence.

## II.    Standard of Review

"The district court's interpretation of Iowa Code section 804.20 is reviewed for errors at law." *State v. Hellstern*, 856 N.W.2d 355, 360 (Iowa 2014) (quoting *State v. Walker*, 804 N.W.2d 284, 289 (Iowa 2011)); *accord State v. Lyon*, 862 N.W.2d 391, 394 (Iowa 2015). "We will affirm a district court's ruling on a motion

to suppress when the court correctly applied the law and there is substantial evidence to support the court's fact-finding." *Lyon*, 862 N.W.2d at 394.

## III.     Analysis

Dunphy argues he was not afforded his statutory rights under Iowa Code section 804.20, which provides:

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney. If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained. . . . An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay.

Dunphy complains that when he began speaking with an attorney, Abell advised him his time was up to reach a decision as to whether to consent to or refuse chemical testing, although there was approximately an hour remaining in the two-hour testing period imposed by statute for purposes of license revocation for refusal to submit to testing. *See* Iowa Code § 321J.6(2) ("If the peace officer fails to offer a test within two hours after the preliminary screening test is administered . . . or the arrest is made, whichever occurs first, a test is not required, and there shall be no revocation under section 321J.9."); *see also Reed v. Iowa Dep't of Transp.*, 478 N.W.2d 844, 847–48 (Iowa 1991) (explaining the two-hour time limit under 321J.6(2) applies to section 321J.9 revocations based on refusal to submit to testing, but not to section 321J.12 revocations based on test results).

Dunphy both submitted to a preliminary breath test and was arrested at 2:33 a.m. The two-hour time limit under section 321J.6(2) was therefore set to expire at 4:33 a.m. As a preliminary matter, it is undisputed that this statutory time deadline effectually limits the time for consultation. *See Haun v. Crystal*, 462 N.W.2d 304, 306 (Iowa Ct. App. 1990) (noting the "right . . . is limited to those circumstances which will not materially interfere with the taking of the test within the time specified in Iowa Code section 321J.6(2)"); *see also State v. Vietor*, 261 N.W.2d 828, 831 (Iowa 1978) ("[A] chemical test is to be administered within two hours of the time of arrest or not at all."). The testing process commenced at 3:32 a.m. and concluded around 3:39 a.m. There was approximately an hour left before the section 321J.6(2) deadline expired.

This deadline, however, was not the only deadline in play. Iowa Code section 321J.2(12)(a) also provides that if law enforcement obtains a specimen "within two hours after the defendant was driving or in physical control of a motor vehicle [it] is presumed to be the alcohol concentration at the time of driving or being in physical control of the motor vehicle." This deadline is also a limitation upon section 804.20 consultation rights. *See Hellstern*, 856 N.W.2d at 361 n.1 ("The time for consultation is limited by the need to conduct chemical testing within two hours after defendant stopped driving."); *Walker*, 804 N.W.2d at 290 ("The time for consultation is . . . effectively limited by law enforcement's interest in obtaining the test within two hours in order to preserve the presumption afforded under Iowa Code section 321J.2[(12)](a)."). Dunphy was stopped at 2:03 a.m. As such, the two-hour deadline under section 321J.2(12)(a) was set to expire at 4:03 a.m.,

about thirty minutes after the testing process commenced and twenty-four minutes after it concluded.

With the deadline imposed by section 321J.2(12)(a) in mind, we reiterate the following relevant facts. Almost immediately upon arriving at the law enforcement center at 2:41 a.m. and reading Dunphy the implied-consent advisory, Abell advised Dunphy he did not need to make a decision about testing yet, but would be allowed to make phone calls to obtain advice from anyone, "[w]hether it be family members, friends, lawyers," or "whoever it may be." Abell advised Dunphy of his rights more than once, and Dunphy indicated his understanding of the same. Abell instructed Dunphy how to use the phone in the OWI room, advised he could use his cell phone to make any calls he desired, and provided Dunphy with two phone books. Dunphy exercised his section 804.20 rights by calling Susan at 2:48 a.m. and engaging in a call that lasted nearly two and a half minutes. Despite being aware that he was entitled to a number of additional calls, Dunphy made no attempt to call anyone else.

After Susan arrived at 3:03 a.m., she made a number of statements indicating she was attempting to make contact with her attorney, Jim Sinclair. However, Susan later stated, "Jim wasn't available" and she was waiting to get a number from him for another attorney. At about 3:16 a.m., Dunphy questioned "Where's my lawyer?" Susan responded "I'm trying to find one." Abell then indicated he would allow additional time for Dunphy to make contact with an attorney. Despite Sinclair's apparent unresponsiveness and Abell's repeated admonishments that Dunphy's time to decide was waning, neither Dunphy nor Susan took any steps to contact a different lawyer. At 3:19 a.m., Abell redirected

Dunphy and Susan to the phonebooks if they wanted to call "a lawyer or anything like that." Neither Dunphy nor Susan reached for a phonebook, one of which Dunphy was resting his elbow on. Abell requested a specimen at 3:25 a.m., upon which Susan advised Sinclair was "not in town" and indicated she could not get ahold of him. Contact was made with Sinclair at 3:27 a.m. Dunphy spoke on the phone with Sinclair for a total of nearly two minutes and forty seconds. In the middle of that conversation, Sinclair spoke with Abell and, according to his testimony, advised he "would like to come down to the jail or have another attorney come down to the jail to speak with Mr. Dunphy in person and privately." Abell advised he had already provided ample time for that, Dunphy was now out of time, and that he would be invoking implied consent as soon as Dunphy and Sinclair finished their telephone call. After Sinclair and Abell finished their conversation, Abell returned the phone to Dunphy and allowed him further conversation with Sinclair. Thereafter, Sinclair and Dunphy terminated the call upon their own volition, with no request on the part of Abell to discontinue the call. After the phone call, Dunphy consented to chemical testing.

To determine whether Dunphy was denied his right to consultation under section 804.20, two distinct inquiries are required—(1) whether Dunphy invoked his rights under section 804.20 and (2) whether he was provided a reasonable opportunity to exercise those rights. *See State v. Hicks*, 791 N.W.2d 89, 94, 96–97 (Iowa 2010). Although Dunphy took absolutely no action to call an attorney despite being aware he was allowed to do so, we find he invoked his statutory right to call an attorney, as he indicated he wanted to speak with an attorney multiple times. *See id.* at 95 ("[W]hen a suspect 'restrained of [his] liberty' makes a

statement that can reasonably be construed as a request to communicate with . . . an attorney, the suspect has invoked his section 804.20 right to communicate with . . . counsel." (second alteration in original)).

It is generally undisputed that Dunphy was afforded his rights under section 804.20 up until the time that contact was made with Sinclair. The fact that Dunphy was provided that amount of time to contact an attorney is, in and of itself, sufficient for us to comfortably conclude Dunphy was provided a reasonable opportunity to exercise his rights, especially in light of the indication in the record that Sinclair was unreachable and the fact that Dunphy took no action to contact a different attorney despite being advised several times that his time to reach a decision was running out. We will, however, consider Dunphy's arguments. Dunphy only argues that when he came into contact with Sinclair, Abell unreasonably restricted the length of the conversation by advising, "You are out of time" and, "Either you sign it yourself or I'm going to sign you as a refusal, literally in fifty seconds." Dunphy maintains this was an unreasonable restriction because there was still approximately one hour remaining before the deadline imposed by section 321J.6(2) expired. Of course, this argument ignores the facts that Dunphy was provided with ample time to contact a different attorney prior to Sinclair finally making contact and Dunphy allowed that time to decay, choosing instead to use that time to confront Abell about various other matters. Furthermore, we note there was little more than thirty minutes remaining before the expiration of the deadline imposed by section 321J.2(12)(a), which is a limitation on consultation rights under section 804.20.

Even if we were to ignore the ample amount of time to contact an attorney that was provided to and wasted by Dunphy prior to Sinclair's call, acknowledging there was time remaining before the deadlines expired and Abell advised Dunphy he was "out of time" and he was going to mark the advisory as a refusal "literally in fifty seconds," we are unable to find Abell did not provide Dunphy with a reasonable opportunity to consult with counsel. After Abell advised he was going to mark the advisory as a refusal "literally in fifty seconds," Dunphy continued to speak with Sinclair for nearly half a minute and then Abell spoke with Sinclair for just under a minute. During this conversation, Abell advised he would be invoking implied consent as soon as Sinclair and Dunphy concluded their conversation. Abell then returned the phone to Dunphy and allowed him to continue his conversation with counsel. Although Abell did previously advise he was going to mark Dunphy down as a refusal "literally in fifty seconds," he did not do so. Instead, he allowed Dunphy and Sinclair to finish their discussion and thereafter took no action to terminate their discussion. Under these circumstances, we find Dunphy was afforded a reasonable opportunity to consult with counsel at this juncture. *See Moore v. Iowa Dep't of Transp.*, 473 N.W.2d 230, 231 (Iowa Ct. App. 1991) (noting the limited right to consultation "is satisfied if the arrestee is permitted to make a phone call to his or her attorney").[2]

---

[2] We find this case distinguishable from *State v. Pettengill*, No. 08-1732, 2009 WL 3086586, at *2–3 (Iowa Ct. App. Sept. 17, 2009), which Dunphy contends controls, where we found a violation of section 804.20 where an officer unnecessarily terminated a phone call between defendant and his father with forty-seven minutes remaining before the statutory deadline. In this case, Abell advised he would be invoking implied consent when the call terminated, and then he allowed the call between Dunphy and counsel to continue until Dunphy and Sinclair terminated the call on their own volition.

We are left with Abell's denial of Sinclair's request "to come down to the jail or have another attorney come down to the jail to speak with Mr. Dunphy in person and privately." *See* Iowa Code § 804.20 ("An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay."). The record reflects Sinclair was "not available" to come to the jail to speak with Dunphy as he was "not in town." As to Sinclair's request that "another attorney" be allowed to meet with Dunphy, there is no evidence in the record to suggest another attorney had been procured that could have come to the jail and meet with Dunphy in time for both consultation and testing prior to the deadline. Furthermore, Dunphy himself never requested a private, in-person consultation.

We find no violation of section 804.20. We affirm Dunphy's conviction of operating while intoxicated.

**AFFIRMED.**